[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case involves the construction of a trust. The following facts are not in dispute. On January 11, 1990, Samuel Salowitz executed his last will and testament ("the Will") which sets forth the intended distribution of his property upon his death. The Will provides that substantially all his property, which includes 598 shares of stock in City Building Supply Co. Inc. and certain other assets, shall pass to the then Trustee or Trustees of the Trust known as the SAMUEL D. SALOWITZ TRUST ("the Trust"), which was also signed by Mr. Salowitz on the 11th day of January, 1990. Mr. Salowitz died on December 19, 1991. The Trust provides that after Mr. Salowitz's death, payments will be made for the benefit of Mr. Salowitz's wife, Eva, during her lifetime. The Trust further provides that, upon her death, which has occurred, the corpus shall be distributed to Mr. Salowitz's only two surviving children, who are the plaintiff and the defendant in this action. The only other child of Mr. Salowitz, Morton, died on May 9, 1990.
The defendant is the Executor under the Will and is also designated the Trustee under the Trust. The defendant, as Executrix of the estate of Samuel Salowitz, has filed her inventory and final accounting with the Probate Court for the District of West Hartford. Per the inventory, the property in the estate consists of approximately One Millon Two Hundred Thousand Dollars ($1,200,000) in assets, of which, approximately One Millon Dollars ($1,000,000) is comprised of 598 shares of stock in City Building Supply Co., Inc., (i.e. $1,672 per share) and of which approximately $200,000 is in cash or other assets. Section 8.2 of the Trust provides for division and distribution of Trust property as follows: CT Page 7499
 (a) In the event the Family Trust consists of stock in CITY BUILDING SUPPLY CO., INC. (or its successor, then:
 (1) Fifty (50) shares of such stock to BRENDA S. KURNS and in the event she is not then surviving, to her then living Issue, per stirpes.
 (2) Forty-Eight (48) shares of such stocks to MORTON SALOWITZ and if he is not then surviving, to be divided equally between BRENDA S. KURNS and CAROL LEE SILVERMAN, or in the event either fail to survive, to their living Issue, per stirpes.
 (b) The balance of the Family Trust, or an amount equal to one-third (1/3) of the value of the entire Family Trust at that time, whichever is less, to CAROL LEE SILVERMAN, and in the event she is not then surviving, to her then living Issue, per stirpes.
 (c) Any remaining portion of the Family Trust shall be divided equally between BRENDA S. KURNS, and in the event she is not surviving, to her then living Issue, per stirpes, and MORTON SALOWITZ, and in the event he is not then surviving, equally to BRENDA S. KURNS and CAROL LEE SILVERMAN, or in the event either fail to survive, to their then living Issue, per stirpes.
To date there has been no distribution of Mr. Salowitz's assets whatsoever.
Each beneficiary claims a controlling interest in the business based on their respective interpretations of the language of Section 8.2.
I. Construction of the Trust Document
The issue presented is construction of a trust instrument in order to distribute the trust property in the manner intended by the settlor. The preferred construction applies the clear intent of the settlor that the trust property be divided equally among all three children of the settlor, and, in the event of the son Moron not, surviving, then equally between the two sisters, Carol CT Page 7500 and Brenda, or their surviving heirs.
"`The issue of intent as it relates to the interpretation of a trust instrument . . . is to be determined by examination of the language of the trust instrument itself and not by extrinsic evidence of actual intent.' Heffernan v. Freedman,177 Conn. 476, 481, 418 A.2d 895 (1979). The construction of a trust instrument presents a question of law to be determined in the light of facts that are found by the trial court or are undisputed or indisputable. See Connecticut National Bank TrustCo. v. Chadwick, 217 Conn. 260, 266, 585 A.2d 1189 (1991)."Cooley v. Cooley, 32 Conn. App. 152, 159, 628 A.2d 608, cert. denied 228, Conn. 901, 634 A.2d 295 (1993). "We cannot rewrite . . . a trust, instrument. The expressed intent must control, although this is to be determined from reading the instrument as a whole in the light of the circumstances surrounding the . . . settlor when the instrument was executed, including the condition of her estate, her relations to her family and beneficiaries, and their situation and condition. The construing court will put itself as far as possible in the position of the . . . settlor in the effort to construe . . . any uncertain language used by her in such a way as shall, conformably to the language, give force and effect to her intention. . . . But the quest is to determine the meaning of what the . . . settlor said and not to speculate upon what she meant to say." Id.
"The issue of intent as it relates to the interpretation of a trust instrument . . . is to be determined by examination of the language of the trust instrument itself and not by extrinsic evidence of actual intent." Heffernan v. Freedman, 177 Conn. 476, 481,418 A.2d 895 (1979). "[A] fundamental tenet for the construction of a . . . trust is to ascertain, within the bounds of the law, the intent of the testator, grantor or settlor. . . . In determining the intent of the settlor, the words used in the instrument are to be interpreted in their ordinary sense, and all of the provisions of the trust instrument must be construed together, with every word given effect, if possible. . . . When the language of the trust instrument is not ambiguous, intent can be ascertained from the express terms of the trust itself. (Citations omitted; internal quotation marks omitted.) Tremaine v. Tremaine,235 Conn. 45, 61, 663 A.2d 387 (1995). CT Page 7501
The settlor's intent in Section 8.2(a), (b), and (c), of the trust document, which provides for the division and distribution of the trust property, is clear and unambiguous. In the event that all three children survived him, he intended that each would receive a third of the trust property, and an approximate one-third of the shares of the company. The clear language of the trust instrument provides that the property of the trust be divided equally among the three children, with the exception that the shares of the company be divided slightly disproportionately: 200.33 shares to Brenda, 199.33 shares to Carol, and 198.33 shares to Morton. (This is not necessarily disproportionate as between Brenda and Carol because Carol already holds one share, thus Brenda and Carol's shares would be equal. However, there is still one outstanding share unaccounted for that was held by the settlor's wife.)
Section 8.2(a)(1) of the trust instrument provides: "Fifty (50) shares of such stock [in the family trust] to Brenda S. Kurns and in the event she is not then surviving, to her then living Issue, per stirpes." It is clear from the language that the settlor intended that Brenda have fifty shares of the company stock. (This seemingly disproportionate distribution ultimately results in Brenda having the same number of shares as Carol after the distribution in subsection (b) and the addition of Carol's already held share. However, Morton receives two shares less than both.) The remaining shares after this distribution is 548.
Section 8.2(a)(2) provides: "Forty-eight shares of such stock to Morton Salowitz and if he is not then surviving, to be divided equally between Brenda S. Kurns and Carol Lee Silverman, or in the event either fail to survive, to their then living Issue, per stirpes." It is clear from the language that it was the intent of the settlor that Morton have forty-eight shares of the company stock, and that in the event that Morton did not survive, his shares were to be divided equally between the two remaining sisters. This is in keeping with the intent that his children should share equally. Thus, in the present case, each sister receives twenty-four of the forty-eight shares. After this distribution, there are 500 shares remaining in the trust, Brenda now having 74 shares, and Carol 24 shares.
Section 8.2(b) provides: "The balance of the Family Trust, or an amount equal to one-third (1/3) of the value of the entire Family Trust at that time, whichever is less, to Carol Lee Silverman, and in the event she is not then surviving, to her CT Page 7502 then living Issue, pet stirpes." Although the parties wish to read ambiguity into this section, the language is clear that the intent of the settlor was for Carol to have one-third of the entire family trust, in keeping with the intent that the three children should share equally. One-third of the entire value of the trust, 598 shares of stock and $200,000, is less than the balance of the trust after the distribution in section 8.2(a), 500 shares of stock and $200,000. Thus, pursuant to the plain language of the instrument and the clear intent of the settlor, in the present circumstances, Carol's share should be one-third of the entire family trust. The language is clear that the one-third share is based on the entire trust, not the balance. An inequity that was clearly not the intent of the settlor would result if the plain words in section 8.2(b) as to the "entire trust" were interpreted to mean anything less than 598 shares plus $200,000. Thus, Carol receives one-third, or 199.33, of all shares of stock, and one-third of the $200,000 in cash in the trust, $66,666.66. After this distribution, there are 300.66 shares of stock and $133,333.33 remaining in the trust. Brenda now has 74 shares, Carol has 223.3 shares and $66,666.66.
Section (c) provides: "Any remaining portion of the Family Trust shall be divided equally between Brenda S. Kurns, and in the event she is not surviving, to her then living Issue, per stirpes, and Morton Salowitz, and in the event he is not then surviving, equally to Brenda S. Kurns and Carol Lee Silverman, or in the event either fail to survive, to their then living Issue, per stirpes." The language here, again, provides the clear intent of the settlor that all three children should share equally in the trust. It is clear that the balance of the trust (300.66 shares and $133,333.33) is divided between Brenda and Morton, which makes their shares essentially equal to Carol's share after the distribution in subsection (b). Thus, Brenda receives half of the 300.66 shares remaining after the distributions from sub-sections (a) and (b), or 150.33 shares, and half of the cash, $66,666.66. This, when added to the seventy-four shares from sub-section (a), gives her a total of 224.33 shares, plus $66,666.66.
If Morton had survived he would have received 150.33 shares as well. The language is quite clear that, in the event that he did not survive, his portion of the remaining balance was to be divided equally between the two sisters, in keeping with the intent of the settlor that the distribution should be equal. Therefore, Brenda and Carol each share in Morton's portion, and CT Page 7503 each receives 75.16 shares of stock and $33,333.33. Thus, after the distribution from subsection (c), Brenda has in total 299.5 shares of stock and $100,000, and Carol has in total 298.5 shares of stock and $100,000.
With the addition of the share of stock Carol already holds, the sisters hold equal shares in the company, thereby sharing control of the company, and they receive equal amounts of cash from the trust. From the plain language of the entire trust instrument, this result is clearly the intent of the settlor.
It is clear from the plain language of the trust that the settlor intended that the trust property be divided equally among all three children, and, in the event of Morton not surviving him, the trust property would be divided equally between Brenda and Carol. There is no ambiguity in the language of the instrument.
II. Administrator as Beneficiary
It is not proper for Brenda, as the administrator of the trust, to make distribution decisions in which she is an interested beneficiary, which may result in a benefit to herself at the expense of the other beneficiary, Carol.
A potential conflict of interest may arise where an executor has dual roles. Ramsdell v. Union Trust Co., 202 Conn. 57, 56,519 A.2d 1185 (1987). "The plaintiff is a fiduciary who has been placed by the testator in a position where her duty of loyalty to the other beneficiaries now conflicts with her own interests as a beneficiary. She chose to accept the fiduciary obligations notwithstanding the obvious potential conflicts of interest, and these have now become actual conflicts of interest. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee and we add an executrix is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard or behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the `disintegrating erosion' of particular exceptions. . . . Only thus has the level of conduct for fiduciaries been kept . . . higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this CT Page 7504 court. . . . This . . . aptly states the law of Connecticut as to conflicts of interest such as appear in this case." (Citations omitted; internal quotation marks omitted.) Adams v. Williamson,150 Conn. 105, 111-12, 186 A.2d 157 (1962).
"The general rule is well established that a trustee shall not engage in self-dealing — that is, shall not deal as a trustee with himself as an individual. `The test of forbidden self-dealing is whether the trustee has a personal interest in the subject transaction of such a substantial nature that it might affect his judgment in material connection.' 76 Am.Jur.2d Trusts § 384 (p. 379). The prohibition of self-dealing by a trustee extends to buying trust assets, selling assets to the trust, borrowing money from the trust, commingling trust and personal assets. 76 Am.Jur.2d Trusts §§ 384-388; Bogert, Trusts andTrustees 2d Ed. rev (1993) §§ 543, 543(A), (B), (C), (D), (E)." Rosetti v. Amenta, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 705787 (August 8, 1997, Satter, J.).
Accordingly Brenda may not elect to satisfy Carol's portion of the family trust by allocating to Carol more cash and fewer shares of stock in the business. This would result in Brenda giving herself a greater number of shares of stock and thus a greater controlling interest in the business. This would be prohibited self-dealing. Distribution as to both the shares of stock in the business and cash must be in accordance with this court's direction in Part I of this decision.
III. Extrinsic Evidence
The plain language of the trust instrument is clear and unambiguous as to the intent of the settlor, and does not allow for a conclusion of mistake or scrivener's error. Therefore, there is no grounds for the admission of extrinsic evidence as to the intent of the settlor in order to interpret the instrument.
"The issue of intent as it :elates to the interpretation of a trust instrument, however, is to be determined by examination of the language of the trust instrument itself and not by extrinsic evidence of actual intent.' Heffernan v. Freedman, supra, 177 Conn. "We cannot rewrite . . . a trust instrument. The expressed intent must control, although this is to be determined from reading the instrument as a whole in the light of the circumstances surrounding the . . . settlor when the instrument CT Page 7505 was executed, including the condition of her estate, her relations to [her] family and beneficiaries, and their situation and condition. The construing court will put itself as far as possible in the position of the . . . settlor in the effort to construe . . . any uncertain language used by her in such a way as shall, conformably to the language, give force and effect to her intention. . . . But the quest is to determine the meaning of that the . . . settlor said and not to speculate upon what she meant to say." Cooley v. Cooley, supra, 32 Conn. App. 159. "Evidence of intention of a testator is inadmissible where it does not find expression in the will, where it consists of declarations of the testator as to the meaning of the words used, where it seeks to give to the words used a meaning which goes beyond any reasonable construction which they can bear, or where it gives them significance different from their usual and ordinary meaning, unless, on reading the will in the light of surrounding circumstances, a latent ambiguity appears."McFarland v. Chase Manhattan Bank, N.A., 32 Conn. Sup. 20, 27,337 A.2d 1, aff'd 168 Conn. 411 (1975).
"Connecticut law does not permit the introduction of extrinsic evidence on the issue of mistake . . . . ConnecticutJunior Republic v. Sharon Hospital, 188 Conn. 1, 4, 448 A.2d 190
(1982). "[P]arol evidence may not be admitted . . . to show that the scrivener erred in drafting the codicil or that the testator mistakenly signed it. Connecticut law does not allow extrinsic evidence or a testator's intent to be admitted in cases dealing with either will construction or cases challenging the probate of an instrument. [T]here is an exception to this rule when there is ambiguity on the face of the will or codicil itself . . . ." Id., 9. See also McFarland v. Chase ManhattanBank. N.A., supra, 32 Conn. Sup. 29. "In seeking to determine the testator's intent, we examine the language of the entire will in the light of the circumstances which surrounded the testator at the time he executed it, the realquestion being, not what did the testator mean to say, butwhat did he mean by what he did say." (Emphasis in the original; internal quotation marks omitted.) Id., 31.
This court's ruling that extrinsic evidence as to intent and mistake is not allowed is based on the above stated analysis.
Hennessey, J. CT Page 7506